**Slip Op. 20-93**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| **CONFEDERACIÓN DE ASOCIACIONES AGRÍCOLAS DEL ESTADO DE SINALOA, A.C., ET AL.,** | |
| Plaintiffs, | |
| v. | |
| **UNITED STATES,** | **Before: Jennifer Choe-Groves, Judge** |
| Defendant, | **Court No. 19-00203** |
| and | |
| **THE FLORIDA TOMATO EXCHANGE,** | |
| Defendant-Intervenor. | |

| | |
|---|---|
| **CONFEDERACIÓN DE ASOCIACIONES AGRÍCOLAS DEL ESTADO DE SINALOA, A.C., ET AL.,** | |
| Plaintiffs, | |
| v. | |
| **UNITED STATES,** | **Court No. 19-00206** |
| Defendant, | |
| and | |
| **THE FLORIDA TOMATO EXCHANGE,** | |
| Defendant-Intervenor. | |

---

ASOCIACIÓN MEXICANA DE
HORTICULTURA PROTEGIDA, A.C.,
ET AL.,

      **Plaintiffs,**

v.

UNITED STATES,

      **Defendant,**

**and**

THE FLORIDA TOMATO EXCHANGE,

      **Defendant-Intervenor.**

           **Court No. 20-00036**

---

### OPINION AND ORDER

[Granting Defendant's motion to dismiss for failure to state a claim.]

Dated:  July 7, 2020

Christopher Ryan, Thomas B. Wilner, Robert S. LaRussa, and Neil H. Koslowe, Shearman & Sterling LLP, of Washington, D.C., and Spencer S. Griffith, Bernd G. Janzen, Yujin K. McNamara, and Devin S. Sikes, Akin Gump Strauss Hauer & Feld LLP, of Washington, D.C., for Plaintiffs Confederación de Asociaciones Agrícolas del Estado de Sinaloa, A.C., Consejo Agrícola de Baja California, A.C., Asociación Mexicana de Horticultura Protegida, A.C., Asociación de Productores de Hortalizas del Yaqui y Mayo, and Sistema Producto Tomate.[1]

Elizabeth Anne Speck, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of New York, N.Y., for Defendant United States.  On the brief were Joseph H. Hunt, Assistant Attorney General, Jeanne E. Davidson, Director, and Franklin E. White, Jr., Assistant Director.  Of counsel was Emma T. Hunter, Office of Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce.

---

[1] Plaintiffs substituted the law firm of Shearman & Sterling LLP for Akin Gump Strauss Hauer & Feld LLP as counsel of record after Defendant's motion to dismiss was fully briefed.  Notice of Substitution of Att'y, ECF No. 37, Court No. 19-00203; ECF No. 36, Court No. 19-00206; ECF No. 25, Court No. 20-00036.

Jonathan M. Zielinski, Robert C. Cassidy, Jr., Charles J. Levy, James R. Cannon, Jr., Mary Jane Alves, and Chase J. Dunn, Cassidy Levy Kent (USA) LLP, of Washington, D.C., for The Florida Tomato Exchange.

Choe-Groves, Judge:  Plaintiffs Confederación de Asociaciones Agrícolas del Estado de Sinaloa, A.C. ("CAADES"), Consejo Agrícola de Baja California, A.C. ("CABC"), Asociación Mexicana de Horticultura Protegida, A.C. ("AMHPAC"), Asociación de Productores de Hortalizas del Yaqui y Mayo ("APHYM"), and Sistema Producto Tomate ("SPT"), and their individual members (collectively, "Plaintiffs" or "Mexican Growers") filed three complaints, which the Mexican Growers have submitted in three forms to satisfy all possible jurisdictional requirements and the North American Free Trade Agreement ("NAFTA") procedures.[2]  The Mexican Growers challenge the Department of Commerce's ("Commerce") withdrawal and termination from a suspension agreement, the continuation of the subject antidumping duty investigation on fresh tomatoes from Mexico, and Commerce's final determination made in the subject antidumping duty investigation.  Compl. ¶ 1; Fresh Tomatoes from Mexico, 84 Fed. Reg. 20,858, 20,860 (Dep't Commerce May 13, 2019) (termination of suspension agreement, rescission of administrative review, and continuation of the antidumping duty investigation) ("May 2019 Withdrawal Notice"); Fresh Tomatoes from Mexico, 61 Fed. Reg. 18,377 (Dep't Commerce Apr. 25, 1996) (notice of initiation of antidumping duty investigation); Fresh Tomatoes from Mexico, 61 Fed. Reg. 56,618 (Dep't Commerce Nov. 1, 1996) (suspension of

---

[2] CAADES filed complaints in the following matters:  CAADES v. United States, Court No. 19-00203, ECF No. 14; CAADES v. United States, Court No. 19-00206, ECF. No. 13; and AMHPAC v. United States, Court No. 20-00036, ECF No. 2.  Even though the order of the named plaintiffs is arranged differently in Court No. 20-00036, CAADES filed the complaint. For ease of reference and because the three complaints are generally identical, except in paragraph 7 of the complaint in Court Nos. 19-00203 and 19-00206 (the timeliness of the action), and the pleading of jurisdiction in Court No. 20-00036, the court refers to the three complaints as the "Complaint" and, unless otherwise noted, cites only to the Complaint in the first-filed case, Court No. 19-00203.

antidumping investigation); <u>Fresh Tomatoes from Mexico</u>, 61 Fed. Reg. 56,608 (Dep't

Commerce Nov. 1, 1996) (preliminary determination) ("<u>1996 Preliminary Determination</u>").

Specifically, Plaintiffs allege that Commerce's "[final] determination is based on a sham

investigation that Commerce invalidly undertook after it unlawfully terminated a 2013

suspension agreement between the Secretary of Commerce and the Mexican Growers and forced

the Mexican Growers to sign a 2019 suspension agreement."  Compl. ¶ 1.  Plaintiffs are parties

to the suspension agreements involved in this case and are subject to the challenged final

determination issued by Commerce.  <u>Id.</u> ¶ 2.

Before the court is Defendant United States' Motion to Dismiss Plaintiffs' Complaints for

lack of subject matter jurisdiction and for failure to state a claim upon which relief can be

granted.  Def.'s Mot. to Dismiss Br., ECF No. 30 ("Def. Br.").  Plaintiffs opposed.  Pls.' Opp'n

to Def.'s Mot. to Dismiss Pls.' Compls., ECF No. 33 ("Pls. Opp'n").  Defendant replied.  Def.'s

Reply in Supp. of its Mot. to Dismiss Pls.' Compls., ECF No. 36 ("Def. Reply").[3]

For the reasons that follow, Defendant's motion to dismiss is granted.

I.    **BACKGROUND**

   **A.  History of the Fresh Tomatoes from Mexico Antidumping Duty Proceeding**

Commerce's investigation of fresh tomatoes from Mexico spans almost a quarter century.

In April 1996, Commerce initiated an antidumping duty investigation to determine whether

imports of fresh tomatoes from Mexico were being, or likely to be, sold in the United States at

less than fair value.  <u>Fresh Tomatoes from Mexico</u>, 61 Fed. Reg. at 18,377.  Following a

preliminary determination from the International Trade Commission ("ITC"), Commerce made a

---

[3] Defendant-Intervenor The Florida Tomato Exchange did not join in Defendant's motion to dismiss.  Nonetheless, Defendant-Intervenor "support[s] the entirety of the United States' motion and agree[s] with the arguments presented therein."  Def.-Intervenor's Resp. 2, ECF No. 34.

preliminary determination in October 1996, finding that imports of fresh tomatoes from Mexico

were being sold in the United States at less than fair value.  See 1996 Preliminary Determination,

61 Fed. Reg. at 56,608.  Commerce was required to make a final determination within 75 days

after the date of its preliminary determination, 19 U.S.C. § 1673d(a)(1), but it received requests

from five of six mandatory respondents to keep the investigation open, 1996 Preliminary

Determination, 61 Fed. Reg. at 56,609; Compl. ¶ 10.  Under 19 U.S.C. § 1673d(a)(2)(A),

Commerce postponed making a "final determination until the 135th day after the date of

publication of the affirmative preliminary determination in the Federal Register[,]" which was

March 16, 1997.  1996 Preliminary Determination, 61 Fed. Reg. at 56,609; Compl. ¶ 10.

       That same day, Commerce announced that Commerce and the signatories had signed an

agreement to suspend the investigation—the 1996 Suspension Agreement.  Fresh Tomatoes from

Mexico, 61 Fed. Reg. at 56,618; 19 U.S.C. § 1673c(c).[4]  The 1996 Suspension Agreement

provided that exporters were compelled to sell fresh tomatoes in the United States at or above an

established "reference price."  Fresh Tomatoes from Mexico, 61 Fed. Reg. at 56,618.  Commerce

instructed Customs and Border Protection ("CBP") to terminate the suspension of liquidation and

collection of cash deposits, release any bonds, and refund cash deposits.  Compl. ¶ 14 (citing

CBP Message No. 7327113 (Nov. 22, 1996)); see Fresh Tomatoes from Mexico, 61 Fed. Reg. at

56,619.

       Over the next 23 years, Commerce and the signatories entered into a series of suspension

agreements after the Mexican Growers gave notice that they wanted to withdraw from the

---

[4] The term "signatory" or "signatories" throughout the various suspension agreements refers to
"the signatory producers/exporters of fresh tomatoes from Mexico."  Fresh Tomatoes from
Mexico, 84 Fed. Reg. at 49,989; Fresh Tomatoes from Mexico, 78 Fed. Reg. at 14,968; Fresh
Tomatoes from Mexico, 61 Fed. Reg. at 56,619.

operative suspension agreement.  The Mexican Growers informed Commerce of their intent to

withdraw from the relevant suspension agreement three times: in 2002, 2007, and 2013.[5]  Each

time the Mexican Growers announced their withdrawal from the effective suspension agreement,

Commerce terminated the suspension agreement, resumed the antidumping investigation,

suspended liquidation, and instructed CBP to require a cash deposit or bond at the rate set forth

in the 1996 Preliminary Determination.  Fresh Tomatoes from Mexico, 67 Fed. Reg. at 50,860;

Fresh Tomatoes from Mexico, 73 Fed. Reg. at 2889; Fresh Tomatoes from Mexico, 78 Fed. Reg.

at 14,772.  Each time the Mexican Growers withdrew from the relevant suspension agreement,

the parties negotiated and entered into a new suspension agreement, and in 2002, 2008, and

2013, new suspension agreements went into effect.[6]  In those instances, Commerce directed CBP

to refund cash deposits collected during the resumption period of the antidumping duty

investigation and to release any bonds that were posted.  See Compl. ¶¶ 21, 27, 34.  And in each

instance, Commerce resumed the antidumping duty investigation in 2002, 2008, and 2013 "as if"

the 1996 Preliminary Determination had been made and published in the Federal Register on the

effective date of termination and indicated that the investigation would be completed within 135

---

[5] See Fresh Tomatoes from Mexico, 67 Fed. Reg. 50,858, 50,858–59 (Dep't Commerce Aug. 6, 2002) (notice of termination of suspension agreement, termination of sunset review, and resumption of antidumping investigation); Fresh Tomatoes from Mexico, 73 Fed. Reg. 2887, 2887–88 (Dep't Commerce Jan. 16, 2008) (notice of termination of suspension agreement, termination of sunset review, and resumption of antidumping investigation); Fresh Tomatoes from Mexico, 78 Fed. Reg. 14,771, 14,771 (Dep't Commerce Mar. 7, 2013) (notice of termination of suspension agreement, termination of sunset review, and resumption of antidumping investigation).

[6] Fresh Tomatoes from Mexico, 67 Fed. Reg. 77,044 (Dep't Commerce Dec. 16, 2002) (notice of suspension of antidumping investigation); Fresh Tomatoes from Mexico, 73 Fed. Reg. 4,831 (Dep't Commerce Jan. 28, 2008) (notice of suspension of antidumping investigation); Fresh Tomatoes from Mexico, 78 Fed. Reg. 14,967, 14,967–68 (Dep't Commerce Mar. 8, 2013) (notice of suspension of antidumping investigation) ("2013 Suspension Agreement").

days.  Fresh Tomatoes from Mexico, 67 Fed. Reg. at 50,859–60; Fresh Tomatoes from Mexico,

73 Fed. Reg. at 2889; Fresh Tomatoes from Mexico, 78 Fed. Reg. at 14,772.

### B.  Commerce Withdraws from the 2013 Suspension Agreement and Continues the 1996 Fresh Tomatoes Investigation

A clause in the 2013 Suspension Agreement allowed a signatory to withdraw upon giving

90 days' written notice.  Under that clause, Commerce withdrew and terminated the 2013

Suspension Agreement, effective May 7, 2019, and resumed the antidumping investigation.  See

May 2019 Withdrawal Notice, 84 Fed. Reg. at 20,860–61; 2013 Suspension Agreement, 78 Fed.

Reg. at 14,967.  CBP then suspended liquidation of the entries of fresh tomatoes from Mexico

and required the posting of cash deposits or bonds.  May 2019 Withdrawal Notice, 84 Fed. Reg.

at 20,860.  Commerce also postponed the deadline for making a final determination because

"[t]he statute d[id] not identify the timing for completion of this investigation in this particular

scenario."  Id.  Commerce thus resumed the antidumping duty investigation and proceeded

towards making a final determination "as if" Commerce had published the 1996 Preliminary

Determination on May 7, 2019.  Id.[7]

---

[7] Commerce's schedule for issuance of a final determination is based explicitly on the schedule set forth in the 1996 Preliminary Determination:

> As explained in its 1996 Preliminary Determination, Commerce previously postponed the final determination until the 135th day after the date of the preliminary determination. Commerce, therefore, intends to issue its final determination in the investigation 135 days after the effective date of withdrawal from and termination of the 2013 Agreement . . . .

May 2019 Withdrawal Notice, 84 Fed. Reg. at 20,860.

### C.  The Mexican Growers' Lawsuit

On May 9, 2019, two days after Commerce announced its decision to withdraw from the 2013 Suspension Agreement, the Mexican Growers brought suit in this court challenging Commerce's withdrawal from the 2013 Suspension Agreement and moving for a temporary restraining order and preliminary injunction.  The court denied the Mexican Growers' request for a temporary restraining order and preliminary injunction because Plaintiffs failed to show a likelihood of success on the merits and irreparable harm absent injunctive relief.  Confederación de Asociaciones Agrícolas del Estado de Sinaloa, A.C. v. United States, 43 CIT __, __, 389 F. Supp. 3d 1386, 1397–98, 1403 (2019), Court No. 19-00059 ("CAADES I"), aff'd In re Confederación de Asociaciones Agrícolas del Estado de Sinaloa, A.C., 781 F. App'x 982, 983– 84 (Fed. Cir. 2019) (per curiam) (denying a petition for a writ of mandamus and "uphold[ing] the Trade Court's determination that the petitioners [we]re unlikely to succeed on the merits of their challenge to Commerce's actions," when Commerce's withdrawal from the 2013 Suspension Agreement was lawful and otherwise complied with the statutory framework set out in 19 U.S.C. §§ 1673b, 1673d).

On September 11, 2019, the court stayed CAADES I until October 21, 2019.  CAADES I, Order, ECF No. 97.  Following expiration of the stay, the court requested briefing on mootness.  In response, the Mexican Growers and Defendant stipulated to dismissing CAADES I.  CAADES I, Order of Dismissal, ECF No. 103.

### D.  The 2019 Suspension Agreement

Commerce published a Federal Register notice with an effective date of September 19, 2019, announcing the suspension of its antidumping duty investigation of fresh tomatoes from Mexico because Commerce and the Mexican Growers—the signatory producers and exporters

accounting for a substantial portion of imports of fresh tomatoes from Mexico (85% or more of subject imports)—signed a new suspension agreement.  <u>Fresh Tomatoes from Mexico</u>, 84 Fed. Reg. 49,987 (Dep't Commerce Sept. 24, 2019) (notice of suspension of antidumping duty investigation) ("<u>2019 Suspension Agreement</u>"); <u>see</u> 19 U.S.C. § 1673c(b), (c).  No party challenged Commerce's decision to suspend the investigation.  The ITC also announced that it was suspending its antidumping investigation as of September 24, 2019.  <u>Fresh Tomatoes from Mexico</u>, 84 Fed. Reg. 54,639 (Int'l Trade Comm'n Oct. 10, 2019) (notice of suspension of antidumping duty investigation).

### E.  Commerce's Final Determination

Commerce continued its antidumping duty investigation under 19 U.S.C. § 1673c(g) pursuant to timely requests, including from Defendant-Intervenor.  On October 25, 2019, Commerce issued its final determination.  <u>Fresh Tomatoes from Mexico</u>, 84 Fed. Reg. 57,401, 57,401 (Dep't Commerce Oct. 25, 2019) (final determination of sales at less than fair value).  The ITC issued an affirmative injury determination on December 12, 2019.  <u>Fresh Tomatoes from Mexico</u>, 84 Fed. Reg. 67,958 (Int'l Trade Comm'n Dec. 12, 2019) (notice of affirmative injury determination).

### F.  The Current Litigation

Plaintiffs filed three separate actions challenging Commerce's final determination, beginning with filing the Summons in Court No. 19-00203 on November 22, 2019, ECF No. 1, and in Court No. 19-00206 on November 26, 2019, ECF No. 1.  Plaintiffs then filed Complaints in Court No. 19-00203, ECF No. 14, and Court No. 19-00206, ECF No. 13, on December 20,

2019.[8]  On February 5, 2020, Plaintiffs filed the Summons and Complaint concurrently in Court

No. 20-00036, ECF Nos. 1, 2.

      Plaintiffs allege seven causes of action.  Specifically, Plaintiffs challenge as "unlawful,

and null, and void" Commerce's termination of the 2013 Suspension Agreement, Compl. ¶¶ 53–

55 (Count One), ¶¶ 56–58 (Count Two);[9] resumption of the antidumping duty investigation, id.

¶¶ 59–62 (Count Three); finalization of the 2019 Suspension Agreement, id. ¶¶ 63–65 (Count

Four); final determination, id. ¶¶ 66–69 (Count Five); and the correctness of certain aspects of

the final determination (the dumping margins and individual rate determinations), id. ¶¶ 70–75

(Counts Six and Seven).  In all, Plaintiffs ask the court to resurrect and reinstate the 2013

Suspension Agreement and declare "unlawful and null and void" the resumed antidumping duty

investigation that Commerce began on May 7, 2019, the 2019 Suspension Agreement, and the

subsequent final determination Commerce made on October 25, 2019.  Id. ¶ 76.

## II.   LEGAL STANDARDS

      Article III of the Constitution limits federal courts to hearing actual, ongoing

controversies.  Davis v. FEC, 554 U.S. 724, 732 (2008).  An actual case or controversy must be

extant at all stages of review, not merely at the time the complaint is filed.  Id. at 732–33; see

---

[8] Plaintiffs assert that "[t]he complaint in Court No. 19-203 was timely filed on November 22, 2019, meeting the requirements of . . . 19 U.S.C. § 1516a(a)(2)(A)(i)(I), and invoking jurisdiction primarily under 28 U.S.C. § 1581(c).  The complaint in Court No. 19-206, which is essentially the same, was timely filed on November 26, 2019, meeting the notice requirements of . . . 19 U.S.C. § 1516a(a)(5)(A), (g)(3)(B), which apply to NAFTA cases, and invoking jurisdiction primarily under 28 U.S.C. 1581(c)."  Pls. Opp'n at 13.  Plaintiffs are incorrect.  The Summonses in Court Nos. 19-00203 and 19-00206 were filed on November 22 and 26, 2019, respectively.  The Complaints were both filed later on December 20, 2019.

[9] Count Two stands out in particular because Plaintiffs represented to this court in CAADES I that Commerce was allowed to withdraw under the terms of the 2013 Suspension Agreement. CAADES I, 389 F. Supp. 3d at 1396 & n.1.

DaimlerChrysler Corp. v. United States, 442 F.3d 1313, 1318 (Fed. Cir. 2006) (noting that the

Court is "presumed to be without jurisdiction unless the contrary appears affirmatively from the

record" (internal quotation marks and citations omitted)).  "Though justiciability has no precise

definition or scope, doctrines of standing, mootness, ripeness, and political question are within

its ambit."  Fisher v. United States, 402 F.3d 1167, 1176 (Fed. Cir. 2005).

    In considering a Rule 12(b)(6) motion to dismiss for failure to state a claim, the court

takes the facts alleged in the complaint as true and views all reasonable inferences from those

facts in the non-moving party's favor.  Ashcroft v. Iqbal, 556 U.S. 672, 678 (2009); Bell Atl.

Corp. v. Twombly, 550 U.S. 544, 570 (2007); A & D Auto Sales, Inc. v. United States, 748 F.3d

1142, 1147 (Fed. Cir. 2014).  Although courts generally consider the allegations contained in the

complaint, the court may also consider documents "incorporated by reference or integral to the

claim, items subject to judicial notice, [and] matters of public record."  A & D Auto Sales, Inc.,

748 F.3d at 1147 (internal quotation marks and citation omitted).  To survive a motion to

dismiss, the "complaint must contain sufficient factual matter . . . to 'state a claim to relief that is

plausible on its face.'"  Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 570).  "A claim

has facial plausibility when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged."  Id.

## III.    DISCUSSION

    Defendant contends that the court is precluded from adjudicating Plaintiffs' claims,

arguing that Plaintiffs cannot show a live case or controversy as to the claims challenging

Commerce's withdrawal from the 2013 Suspension Agreement, resumption of the investigation,

and finalization of the 2019 Suspension Agreement.  Def. Br. at 15–18; Def. Reply at 8.  Further,

Defendant also argues that Plaintiffs need not wait for a judicial declaration that the 2019

Suspension Agreement is "unlawful, null, and void" because Plaintiffs can simply withdraw from the current agreement.  Def. Reply at 8.  For the same reason, Defendant contends that there is no live case or controversy in challenging the final determination because Plaintiffs currently pay no antidumping duties while the 2019 Suspension Agreement remains in effect— an agreement that Plaintiffs can withdraw from at any time.  Def. Br. at 21.  Defendant and Defendant-Intervenor point out that Plaintiffs can challenge the final determination if and when the 2019 Suspension Agreement ends and the antidumping duty order is issued.  Id.; Def-Intervenor Resp. at 5.  Defendant asserts "that this litigation is an attempt to obtain the benefits of a suspension agreement while simultaneously challenging its legality."  Def. Reply at 8.

Plaintiffs counter that the controversy remains live—even though they signed the 2019 Suspension Agreement—because whether the court can invalidate the current 2019 Suspension Agreement and reinstate the 2013 Suspension Agreement is a merits question that goes to the court's power to grant relief, not jurisdiction.  Pls. Opp'n at 17–18.  Plaintiffs argue that the court has the power to invalidate the current agreement and resurrect the 2013 Suspension Agreement because a court decision finding the final determination unlawful would infect the 2019 Suspension Agreement.  Id. at 18.  Plaintiffs next assert that even if the court cannot disturb the 2019 Suspension Agreement and reinstate the 2013 Suspension Agreement, the controversy remains live with Plaintiffs challenging the final determination.  Id. at 18–20.

Plaintiffs plead jurisdiction under Section 1581(c) and, in the alternative, Section 1581(i)(4).  Compl. ¶¶ 4–5.  Section 1581(c) grants the Court exclusive jurisdiction over any civil action commenced under 19 U.S.C. § 1516a, which includes challenges to Commerce's final determination made in an antidumping duty proceeding.  19 U.S.C. § 1516a.  Section

1581(i) is a "residual" grant of jurisdiction over all civil actions against the United States arising

out of, *inter alia*, the "administration and enforcement" of the customs laws.  28 U.S.C.

§ 1581(i)(4).  A party cannot invoke Section 1581(i) jurisdiction "when jurisdiction under

another subsection of § 1581 is or could have been available, unless the remedy provided under

that other subsection would be manifestly inadequate."  See Fujitsu Gen. Am., Inc. v. United

States, 283 F.3d 1364, 1371 (Fed. Cir. 2002) (citations omitted).  Section 1581(i) does "not

confer jurisdiction over an antidumping or countervailing duty determination which is

reviewable . . . by the Court of International Trade under section 516A(a) of the Tariff Act of

1930 [19 U.S.C. § 1516a]."[10]

## A.  The Mootness Doctrine

There is no "case or controversy" under Article III, and a suit becomes moot, "when the

issues presented are no longer 'live' or the parties lack a legally cognizable interest in the

outcome."  Already, LLC v. Nike, Inc., 568 U.S. 85, 91 (2013) (quoting Murphy v. Hunt, 455

U.S. 478, 481 (1982) (per curiam)).  The mootness doctrine applies when "events have so

transpired that the [court's] decision will neither presently affect the parties' rights nor have a

more-than-speculative chance of affecting them in the future."  Clarke v. United States, 915 F.2d

699, 701 (D.C. Cir. 1990) (en banc) (citation omitted).

---

[10] The legislative history of Section 1581(i) shows "that any determination specified in section
516A of the Tariff Act of 1930, [as amended,] or any preliminary administrative action which, in
the course of the proceeding, will be, directly or by implication, incorporated in or superceded by
any such determination, is reviewable exclusively as provided in section 516A."  M S Int'l, Inc.
v. United States, 44 CIT ___, ___, 425 F. Supp. 3d 1332, 1336 (2020) (quoting H.R. Rep. No.
96-1235, at 48 (1980), reprinted in 1980 U.S.C.C.A.N. 3729, 3759–60).

**B. Overcoming the Mootness Bar**

An action can avoid dismissal on mootness grounds if the claims asserted in the

complaint are "capable of repetition, yet evading review." Spencer v. Kemna, 523 U.S. 1, 17

(1998); Torrington Co. v. United States, 44 F.3d 1572, 1577 (Fed. Cir. 1995) (citations omitted).

"[T]he capable-of-repetition doctrine applies only in exceptional situations," where a plaintiff

can show that "(1) the challenged action [is] in its duration too short to be fully litigated prior to

cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining

party [will] be subject to the same action again." Spencer, 523 U.S. at 17 (internal quotation

marks and citations omitted); see Honeywell Int'l, Inc. v. Nuclear Regulatory Comm'n, 628 F.3d

568, 576 (D.C. Cir. 2010) ("The initial heavy burden of establishing mootness lies with the party

asserting a case is moot," yet "the opposing party bears the burden of showing an exception

applies[.]").  Supreme Court precedent recognizes "inherently transitory" claims are capable of

evading review.  U.S. Parole Comm'n v. Geraghty, 445 U.S. 388, 399 (1980); e.g., Davis, 554

U.S. at 735 (election law challenge); Neb. Press Ass'n v. Stuart, 427 U.S. 539, 542 (1976)

(imposing prior restraints on speech); Gerstein v. Pugh, 420 U.S. 103, 110 n.11 (1975) (pretrial

detention conditions).

**C. The Mexican Growers' Claims are Moot**

Plaintiffs' Complaint challenges Commerce's termination of the 2013 Suspension

Agreement, resumption of the antidumping duty investigation, entry into the 2019 Suspension

Agreement, and final determination.  Plaintiffs ask the court to resurrect and reinstate the 2013

Suspension Agreement and declare "unlawful, null, and void" the resumed antidumping duty

investigation conducted by Commerce from May 7, 2019 until September 19, 2019, the 2019

Suspension Agreement, and the subsequent final determination by Commerce.  Here, the event

of Plaintiffs signing the 2019 Suspension Agreement superseded the 2013 Suspension

Agreement.  The court concludes that each of the claims alleged in Plaintiffs' Complaint, as well

as the requested relief from the court, became moot upon Plaintiffs' voluntary signing of the

2019 Suspension Agreement.

Plaintiffs' requests for relief in Counts One, Two, and Three that the court (1) order the

reinstatement of the 2013 Suspension Agreement and (2) declare as "unlawful and null and void"

Commerce's termination of the 2013 Suspension Agreement and continuation of the

investigation Commerce conducted from May 7, 2019 until September 19, 2019 ignores a

determinative fact that Commerce and Plaintiffs signed the 2019 Suspension Agreement, a new

agreement which superseded the 2013 Suspension Agreement.  Compl. ¶¶ 54–55, 57–58, 60–62.

Plaintiffs' decision to enter into the 2019 Suspension Agreement undercuts their assertion that

Commerce unlawfully terminated the 2013 Suspension Agreement.  Id. ¶¶ 53–55, 56–58, 60, 76.

Thus, Plaintiffs cannot ask this court to breathe new life into and reinstate the 2013 Suspension

Agreement when Plaintiffs voluntarily signed the 2019 Suspension Agreement, a new agreement

which superseded the prior 2013 Suspension Agreement.  See 2019 Suspension Agreement, 84

Fed. Reg. at 49,989–99; see also Pub. Utils. Comm'n v. FERC, 236 F.3d 708, 714 (D.C. Cir.

2001) ("Ordinarily, it would seem readily apparent that a challenge to an expired contract is

moot, because the court could provide no relief to the allegedly aggrieved parties.").  Although a

suspension agreement may differ from an expired contract, it is similarly readily apparent to this

court that the finalizing of the 2019 Suspension Agreement terminated and superseded the 2013

Suspension Agreement.  Put differently, Plaintiffs cannot have it both ways: they cannot sign the

new agreement and receive its benefits and protections, while at the same time seek legal

remedies calling for the reinstatement of an expired agreement that was superseded by Plaintiffs'

own actions of entering into the new agreement.

The pleading deficiency in Counts One, Two, and Three contesting Commerce's

withdrawal from the 2013 Suspension Agreement and continuation of the antidumping duty

investigation also infects Plaintiffs' claim in Counts Four and Five challenging the 2019

Suspension Agreement and final determination as "unlawful and null and void."  Compl. ¶¶ 64,

69.  As in Counts One through Three, Plaintiffs' request that the court "reinstate the 2013

Suspension Agreement," id. ¶¶ 65, 69, ignores the unmistakable fact that Plaintiffs and

Commerce are signatories to the new 2019 Suspension Agreement, a new agreement which

"render[ed] nugatory" the 2013 Suspension Agreement.  See Am. Spring Wire Corp. v. United

States, 6 CIT 122, 123 (1983) (finding an importer's challenge to various aspects of a suspension

agreement entered into among Commerce, the International Trade Administration ("ITA"), and

the Government of Brazil moot when, after the action was filed, the ITA issued a final negative

injury determination on subject merchandise from Brazil that rendered the suspension agreement

"null and void ipso facto"); Compl., Ex. 1, ECF No. 14-1 (listing in the 2019 Suspension

Agreement the signatories belonging to the Mexican Growers: AMHPAC, APHYM, CAADES,

CABC, and SPT).  It strains credulity for Plaintiffs to bring a challenge to the 2019 Suspension

Agreement and continued investigation when Plaintiffs voluntarily signed the 2019 Suspension

Agreement and, as signatories to the new agreement, currently pay no antidumping duties

because the final determination has no effect while the new agreement remains operative.  See,

e.g., Usinas Siderúrgicas De Minas Gerais S/A v. United States, 26 CIT 422, 431 (2002) (noting

that a final determination that is issued when Commerce continues an investigation after entering

into a suspension agreement constitutes "a challenge which is not yet (and may never be) ripe[]")

("Usinas"). Consequently, as alleged in Counts Six and Seven, the court is precluded from reviewing whether certain aspects of the final determination (margin calculation and individual rate determination) were "wrong" and "unlawful," Compl. ¶¶ 71, 75, because the dumping margins and individual rate determinations have no effect so long as the 2019 Suspension Agreement is in place. See Am. Spring Wire Corp., 6 CIT at 124 (noting that "[s]uspension agreements . . . will generally be of long duration[]"). The court concludes, therefore, that the claims brought by Plaintiffs and the relief sought from the court, are moot.

Plaintiffs' current remedy may be to withdraw from the 2019 Suspension Agreement, and, in that event, the antidumping duties would take effect. In that case, the antidumping duty investigation would resume, but there is no logical scenario in which the superseded 2013 Suspension Agreement would be reinstated. So long as Plaintiffs remain signatories to the 2019 Suspension Agreement, the dumping margins will have no effect. Thus, any challenge to the final determination is not ripe. See Usinas, 26 CIT at 431; Am. Spring Wire Corp., 6 CIT at 123.[11]

Further supporting the court's conclusion that the claims are moot is the absence of precedent showing instances when the Court has reinstated a prior suspension agreement that was either (1) superseded by a new agreement or (2) entered into after Commerce or the ITC made a final determination.[12] The controversy is no longer live, as Plaintiffs signed the 2019

---

[11] The court in Usinas rejected claims of possible piecemeal litigation and explained that the statute governing suspension agreements, 19 U.S.C. § 1516a(a)(2)(B)(iv), provides that "[a] continued final affirmative determination has no practical effect unless and until the related suspension agreement is dissolved." 26 CIT at 431.

[12] This case differs from this Court's decisions in CSC Sugar LLC v. United States, 43 CIT ___, 413 F. Supp. 3d 1318 (2019), and CSC Sugar LLC v. United States, 43 CIT ___, 413 F. Supp. 3d 1310 (2019). In the CSC Sugar LLC cases, the Court vacated amendments to extant suspension agreements, but did not restore the suspension agreement that was terminated and then

Suspension Agreement, and the court can no longer grant Plaintiffs "any effectual relief,"

Mission Product Holdings, Inc. v. Tempnology, LLC, 139 S. Ct. 1652, 1660 (2019), in the form

of reinstating the superseded 2013 Suspension Agreement or reviewing a challenge to a final

determination that has no current effect.  Therefore, the court dismisses Plaintiffs' claims as

moot.

        This case is not an "exceptional situation" in which Plaintiffs' claims meet an exception

to mootness where the alleged wrongs are "capable of repetition, yet evading review."  See

Spencer, 523 U.S. at 17; see Am. Spring Wire Corp., 6 CIT at 124 (rejecting the plaintiffs'

arguments that the wrongs capable of repetition yet evading review exception applied to a case

concerning a suspension agreement).  Repetition of the complained-of conduct is unlikely to

recur because Plaintiffs signed the 2019 Suspension Agreement and, as signatories to the

agreement, there is no reasonable expectation that the same controversy will recur involving the

same complaining party.  Am. Spring Wire Corp., 6 CIT at 124–25; People for the Ethical

Treatment of Animals, Inc. v. Gittens, 396 F.3d 416, 424 (D.C. Cir. 2005) ("The essential point

is that the case before us is highly dependent upon a series of facts unlikely to be duplicated in

the future. . . .  [A] legal controversy so sharply focused on a unique factual context . . . rarely

present[s] a reasonable expectation that the same complaining party [will] be subjected to the

same actions again.").  Given that the 2019 Suspension Agreement bars Commerce from

applying antidumping duties, that any signatory can withdraw from the current agreement

without penalty, and that the final determination only takes effect if a signatory withdraws from

the current agreement, the possibility that Plaintiffs again will be subjected to the same action is

---

superseded by a new agreement, when finding that Commerce's failure to follow statutory
procedural recordkeeping requirements was beyond harmless and substantially prejudiced the
plaintiff.  413 F. Supp. 3d at 1326; 413 F. Supp. 3d at 1318.

purely speculative and does not rise to a level of "reasonable likelihood" here.  See Spencer, 523 U.S. at 3; Weinstein v. Bradford, 423 U.S. 147, 149 (1975) (per curiam); 2019 Suspension Agreement, 84 Fed. Reg. at 49,994 ("An individual Signatory, or Signatories, collectively, or Commerce may withdraw from this Agreement upon 90 days' written notice to Commerce or the Signatories, respectively.").

In sum, the court does not find the exception to the mootness doctrine satisfied when Plaintiffs continue to reap the benefits of signing the 2019 Suspension Agreement while simultaneously challenging the legality of that agreement.[13]  Plaintiffs pursued a problematic litigation strategy by signing the "unlawful" 2019 Suspension Agreement to avoid paying the antidumping duties that would have been required had Commerce issued the antidumping duty, while maintaining an after-the-fact challenge to the same agreement.  Notwithstanding Plaintiffs' strategy in simultaneously litigating nearly three identical complaints so as to preserve multiple, speculative paths for appeal, Plaintiffs' own actions in signing the 2019 Suspension Agreement prevent the court from adjudicating the claims for relief.[14]

---

[13] Plaintiffs are familiar with the withdrawal provision found in prior suspension agreements, as they withdrew from prior suspension agreements in 2002, 2007, and 2013.  See Fresh Tomatoes from Mexico, 67 Fed. Reg. at 50,858–59; Fresh Tomatoes from Mexico, 73 Fed. Reg. at 2887–88; Fresh Tomatoes from Mexico, 78 Fed. Reg. at 14,771.

[14] Because Plaintiffs' claims are moot, the court need not discuss whether Plaintiffs' challenge of the 2019 Suspension Agreement and Commerce's final determination under 28 U.S.C. § 1581(c) is time-barred or whether equitable tolling applies.

## IV.    CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Defendant's motion to dismiss is granted and Plaintiffs' Complaint is

dismissed with prejudice.  Judgment will enter accordingly.


                                                                 /s/ Jennifer Choe-Groves
                                                    Jennifer Choe-Groves, Judge


Dated:      July 7, 2020
        New York, New York